AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| GREGORY DARWIN CARTER | ) | Case No.   2:22-mj-00498 -DUTY |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

LODGED
CLERK, U.S. DISTRICT COURT
2/7/2022
CENTRAL DISTRICT OF CALIFORNIA
BY         YAM      DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
2/8/2022
CENTRAL DISTRICT OF CALIFORNIA
BY Velverine Warne DEPUTY

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___September 14, 2021___ in the county of ___Los Angeles___ in the ___Central___ District of ___California___, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Interfere with Commerce and Interference with Commerce by Robbery |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

| | |
|---|---|
| | /s/ Michael Fukuda |
| | *Complainant's signature* |
| | FBI SA Michael Fukuda |
| | *Printed name and title* |

Attested by phone

~~Sworn to before me and signed in my presence.~~

Date:   2/8/22

City and state:   Los Angeles, Calfornia

| |
|---|
| *Judge's signature* |
| Hon. Charles Eick |
| *Printed name and title* |
| U.S. MAGISTRATE JUDGE |

*AUSA:* Axelrad x7964

## <u>AFFIDAVIT</u>

I, Michael Fukuda, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint and arrest warrant for GREGORY DARWIN CARTER, for a violation of 18 U.S.C. § 1951(a), Conspiracy to Interfere with Commerce by Robbery and Interference of Commerce by Robbery, (the "SUBJECT OFFENSES.")

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Los Angeles Police Department ("LAPD"), in Los Angeles, California, as described more fully in Attachments A-1, A-2, and A-3:

    a.   a gold iPhone ("SUBJECT DEVICE 1");

    b.   a black and blue Vortex cellphone ("SUBJECT DEVICE 2"); and

    c.   a white and gold iPhone, model number A1661, bearing serial number BCG-E3087A ("SUBJECT DEVICE 3").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the SUBJECT OFFENSES as described more fully in Attachment B. Attachments A-1, A-2, and A-3, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") and have been so employed since 2008.  In
September 2008, I completed 21 weeks of training at the FBI
Academy in Quantico, Virginia, where I received formal training
in criminal investigative tactics, techniques and evidence
collection.  I have received training in, and have conducted,
investigations of bank robberies and violent crime.  From
September 2019 to the present, I have been assigned to the
Violent Crimes Squad and worked as a Hobbs Act Robbery and Bank
Robbery Investigator in the Los Angeles Division of the FBI.

6.    In connection with the robbery investigations in which
I have participated, I have used a variety of investigative
techniques, including witness interviews, speaking with law
enforcement agents and officers, reviewing surveillance images
and cellular telephone data, including cellular tower logs, as
well as collecting and processing physical evidence.  As a
result of this experience and my conversations with other law
enforcement personnel, which includes FBI SAs experienced with

2

bank robbery investigations and commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

### III.  SUMMARY OF PROBABLE CAUSE

7.   On September 14, 2021, an armed robbery occurred at ZERO's, a clothing store specializing in high-end clothing and shoes, located on Melrose Avenue, in Los Angeles.  During the robbery, an employee, D.P., was held at gunpoint by a robber who entered the store and stole clothing and shoes.  Based on a review of video surveillance footage and witness statements, law enforcement subsequently determined that a second robber was acting as a getaway driver.  Specifically, law enforcement was able to identify a black 2019 Jeep Wrangler that was used by the robbery crew.  As a result of the investigation that followed, law enforcement identified J.H. as the gunman and CARTER as the getaway driver of the robbery crew's getaway car, a black 2019 Jeep Wrangler.

8.   Following his arrest on September 23, 2021 for robbery, in violation of Penal Code Section 211, CARTER made statements to law enforcement during which he admitted to driving J.H. in the black Jeep Wrangler to ZERO's and being in the vicinity of ZERO's around the time of the robbery.  J.H. is currently on federal supervised release, following a 2018 conviction for felon and prohibited person in possession of a firearm.  See CR No. 17-00737-R.

9.    On January 19, 2022, J.H. was also arrested for robbery, in violation of Penal Code Section 211.  J.H. waived Miranda and admitted to committing the robbery at CARTER's direction, with a handgun that CARTER provided, and giving the stolen items to CARTER after the robbery.

### IV. STATEMENT OF PROBABLE CAUSE

10.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    The September 14, 2021 Robbery**

11.    On September 14, 2021, at approximately 12:27 p.m., LAPD patrol officers responded to a radio call of a robbery at ZERO's clothing store, located at 7801 Melrose Avenue, Los Angeles, California.  ZERO'S is a clothing store that specializes in the sale of rare and high-end streetwear style clothing and shoes.

12.    An employee of ZERO'S, D.P., was contacted by LAPD and explained that he was inside the store and observed one man enter ZERO's.  The man (later identified as J.H.) threw three white trash bags at D.P., pointed a handgun at D.P., and demanded that he put "Chrome Hearts" sweatshirts and "Travis Scott" shoes into the bags.  After D.P. filled the trash bags with the clothing and shoes, D.P. gave the trash bags to the gunman.  The gunman exited the store and fled on foot eastbound through the alley.

13.  D.P. explained to law enforcement that he was in fear during the robbery as the gunman pointed a gun at him/her while demanding merchandise from the store.

14.  Following the robbery, D.P. was shown a photographic lineup that included a picture of J.H.  D.P. did not identify any individual in the photographic lineup as the gunman from September 14, 2021.

15.  During the robbery, the gunman stole five "Chrome Hearts" hooded sweatshirts, including one black, small size, "Chrome Hearts" Matty Boy America hooded sweatshirt, and one pair of Air Jordan "Travis Scott" shoes, for a total loss of approximately $8,500.

**B.   Review of Surveillance Camera Footage**

16.  I have reviewed the store security video of the inside of the store at the time of the robbery.  On the surveillance camera footage, I observed an individual enter the store wearing a black beanie, a Los Angeles Rams hooded sweatshirt, dark pants, and a medical face mask.  Throughout the robbery, the gunman continuously brandished a black semi-automatic handgun, and at times waved or pointed the handgun menacingly at D.P. After D.P. filled the trash bags with clothing and shoes, the gunman took the bags and said to D.P., "Don't make no scene," before fleeing out the front door.

17.  Following the robbery, law enforcement obtained additional surveillance camera footage from multiple locations surrounding the ZERO's store.  Surveillance camera footage from 7753 Melrose Avenue, Los Angeles, shows that at approximately

11:27 a.m., a black 4-door Jeep Wrangler, bearing California
license plate number 8PUT527, drove westbound through alley
north of Melrose Avenue between Ogden Drive and Genesee Avenue.
Approximately fifty minutes later, at 12:19 p.m., the Jeep made
a turn from Genesee Avenue and drove westbound through the alley
and ultimately pulled over to the side of the alley, facing
eastbound.  The Jeep slowly adjusted its position to the point
that it was no longer visible to the surveillance camera.
Seconds after the Jeep was no longer visible, the gunman, with
his distinctive clothing, came into view and walked westbound in
the alley towards ZERO'S.  At 12:22 p.m., a door on the driver's
side of the Jeep opened and a second individual ("the second
robber")[1] got out of the Jeep.  The second robber was wearing a
white T-shirt, shorts, white shoes, and had long dreadlocks held
up in a dark stocking cap.  The second robber walked eastbound
to Genesee Avenue.  At 12:23 p.m., the gunman walked eastbound
in the alley and disappeared from view where the Jeep was
parked.  At 12:24 p.m., a door on the driver's side of the Jeep
opened and the gunman emerged into view and walked westbound in
the alley towards ZERO's.  Approximately 30 seconds later, the
gunman and the second robber can be seen walking side-by-side
eastbound down the alley back towards the Jeep.  Although both
the gunman and the second robber were wearing face masks, they
appeared to be in conversation as they gestured with their hands
while they walked.  At 12:26 p.m., both the gunman and the

---

[1] As set forth herein, the second robber was the driver for
the robbery.  As further set forth herein, the second robber is
believed to be CARTER.

6

second robber arrived back at the parked Jeep, where the second robber entered the Jeep from the driver's side door.  The gunman can then be seen walking westbound in the direction of ZERO's while putting on gloves as he walked.  At 12:28 p.m., the second robber exited the Jeep and walked eastbound in the alley towards Genesee Avenue, where he disappeared from view.  At 12:30 p.m., just after the robbery, the gunman can be seen running eastbound in the alley from the direction of ZERO's and towards the Jeep, holding the same filled white trash bags that can be seen on the surveillance camera footage from inside ZERO's during the robbery, before disappearing from view.

18.   Due to a technical glitch in the surveillance camera, the recording cuts out for the next 45 seconds.  When the recording resumes, LAPD officers can be seen in the alley near Genesee Avenue.  The LAPD officers were conducting an unrelated traffic stop.  An individual resembling the second robber walks eastbound from Genesee Avenue through the alley; at the same time, the gunman comes into view where the Jeep was parked and walked westbound through the alley from Genesee Avenue.  The gunman was no longer holding any trash bags, and his face mask was pulled down to his chin, exposing his face.[2]

C.   **CARTER's Association with the Black Jeep Wrangler.**

19.   A DMV records check of the Jeep Wrangler's license plate number 8PUT527 (the "Jeep") shows the Jeep registered to "Tatiana Gutierrez" at 9710 Olive Street, Apartment 5,

---

[2]   Based on the investigation that follow, and my review of his California Department of Motor Vehicles ("DMV") photograph, the gunman appears to be J.H.

Bellflower, California 90706.  LAPD records showed that on March 31, 2021, the Jeep was issued a traffic citation in the vicinity of Martin Luther King Boulevard and Menlo Avenue in the city of Los Angeles.  At the time of the traffic citation, the driver of the Jeep was "Carter Mark Kimboll," with an address of 4112 Santo Tomas Drive, Los Angeles, California.  A query of LAPD databases showed that 4112 Santo Tomas Drive was associated to several individuals, including CARTER.  Further review of CARTER's criminal history records showed that on September 17, 2021, CARTER's residential address was updated to 9710 Olive Street, Unit 5, Bellflower, California 90706, the same address as Tatiana Gutierrez, the registered owner of the Jeep.  CARTER's DMV photo, taken on July 19, 2021, shows a strong resemblance to the second robber, including long distinctive dreadlocks that extend past his shoulders.

20.  On September 22, 2021, law enforcement obtained a state search warrant for 9710 Olive Street, Unit 5, Bellflower, California 90706 and the Jeep (i.e., black Jeep Wrangler bearing California license plate 8PUT527).  As law enforcement arrived at the residence to execute the search warrant, the Jeep was observed driving on Olive Street.  Officers conducted a traffic stop on the Jeep and detained CARTER, who was the sole occupant of the Jeep.  During a search of the Jeep, a loaded Glock 19 semi-automatic handgun was found in the engine compartment.  During the ensuing search of 9710 Olive Street, Unit 5, one black, small size, "Chrome Hearts" Matty Boy America hooded sweatshirt was found.

D.   **CARTER's Post-<u>Miranda</u> Interview**

21.  Following the search of his house and car, CARTER was transported to LAPD Wilshire Station for further questioning. CARTER was advised of and waived his <u>Miranda</u> rights, and agreed to speak with law enforcement.  CARTER explained that he and Tatiana Gutierrez drove the Jeep, with the Jeep primarily driven by him.  CARTER stated that he frequented the Melrose corridor because he was into trendy fashion and shoes.  CARTER was shown a screenshot from the surveillance camera footage on September 14, 2021, of the alley north of Melrose Avenue, near ZERO's. CARTER recognized this as an alley in the Melrose corridor behind clothing and shoe stores.  CARTER also recognized the Jeep in the screenshot as the Jeep registered to Tatiana Gutierrez.  CARTER was shown a still of himself in the alley on September 14, 2021 around the time of the robbery, and he identified himself as the person in depicted in the alley. CARTER stated that due to limited street parking, his practice was to park in the alleys surrounding Melrose Avenue.

22.  While initially denying involvement in the robbery, CARTER eventually stated that the gunman was an individual named "Javon," a member of the Broadway Gangster Crips.[3]  Based on the

---

[3]  Investigators also showed CARTER a photo of D.J., who at that time was being considered by investigators as possibly being the gunman.  CARTER denied knowing or ever having met D.J. Further investigation later cleared D.J of any involvement in the robbery.

investigation, including CARTER's own statements, law
enforcement understands "Javon" to be a reference to J.H.[4]

23.  According to CARTER, he ran into J.H. in the Melrose
area and J.H. got into the Jeep that CARTER was driving.  They
drove by a clothing store in the alley to see what time it
opened and noticed that it did not open until noon.  After
CARTER parked the Jeep, J.H. told CARTER he was going to steal
from one of the clothing stores.  CARTER did not go with J.H.,
but instead went to other clothing stores in the area.  When he
returned, CARTER saw the police by the alley and assumed J.H.
had been arrested for stealing.  After the police left, CARTER
walked back to the Jeep and drove away.  CARTER stated that he
did not know J.H. was going to commit a robbery.

24.  CARTER stated that he is a member of the Black P
Stones gang and is a well-known gang member.  He carries a
handgun for personal protection in case he is attacked by rival
gang members.  CARTER acknowledged the handgun found in the Jeep
was his but claimed that J.H. had used another gun during the
robbery.  At the time of his arrest, CARTER was in possession of
SUBJECT DEVICE 1, which was seized and booked as evidence by law
enforcement.

25.  On October 5, 2021, D.P. contacted investigators and
stated that an individual with dreadlocks had come inside ZERO's
and claimed that his residence had been raided by the police.

---

[4]  On September 27, 2021, CARTER and Tatiana Gutierrez met
with LAPD Detectives in order to obtain the release of the Jeep
which had been impounded.  When Detectives showed CARTER a DMV
photo of J.H., CARTER identified J.H. as Javon.

The individual with dreadlocks wanted employees at the store to tell police that he was not involved in the robbery.

26.  On October 19, 2021, investigators obtained ZERO'S surveillance footage that recorded the incident on October 5, 2021, when the individual with dreadlocks was in the store. Investigators immediately recognized the individual as CARTER.

**E.   Identification of J.H.**

27.  On September 25, 2021, LAPD Officer Zavala assigned to the Newton Division Gang Enforcement Detail was asked by investigators if he knew of any 52 Broadway Gangster Crips whose first name was "Javon."  One of the names Officer Zavala suggested was J.H.  A review of J.H.'s criminal history records and DMV records had physical attributes, including height, weight, race, and build, that matched the first robber.  A query of J.H.'s criminal history revealed J.H. had a federal arrest warrant for a probation violation.

28.  On January 19, 2022, law enforcement conducted surveillance at 1843 W. 74th Street, Los Angeles, which, according to DMV records, is one of J.H.'s residences.  While conducting surveillance of J.H.'s residence, officers observed J.H. and another male walking from the residence.  J.H. was taken into custody and, following J.H.'s arrest, a state search warrant for his residence was obtained and executed.  Once the search warrant was obtained, law enforcement conducted a search of 1843 W. 74th Street, Los Angeles.  No evidence related to the September 14, 2021, robbery of ZERO's was recovered inside J.H.'s residence.

11

29.  At the time of his arrest, J.H. was in possession of
SUBJECT DEVICE 2.  In addition, while J.H. was being placed in a
police vehicle, he asked if his brother could retrieve his cell
phone from the garage so he could look up a phone number.
Officers approached an individual that J.H. had identified as
his brother and asked if he could retrieve the phone.  After
several minutes, the individual returned and gave SUBJECT DEVICE
3 to an officer, who retrieved the phone number for J.H..
SUBJECT DEVICE 3 was seized by officers and booked at an LAPD
evidence facility.

**F.  J.H. Admits to Participating in Robbery During Post-
     Miranda Interview**

30.  J.H. was transported to LAPD Wilshire Station for
further questioning.  J.H. was advised of and waived his Miranda
rights, and agreed to speak with law enforcement.  J.H. was
shown surveillance video stills that show J.H., CARTER, and the
Jeep in the alley on September 14, 2021.  J.H. identified
himself as the individual in the video still wearing the Los
Angeles Rams hooded sweatshirt and sweatpants with the word
"Navy" printed on the pants leg.  J.H. was shown a brief video
on a YouTube community page which showed surveillance footage
from the interior of ZERO's during the robbery on September 14,
2021.  J.H. identified himself in the video.  J.H. stated on the
day of the robbery, CARTER picked up J.H. from J.H.'s mother's
residence and drove to the Hollywood area.  CARTER told J.H.
that he needed J.H.'s help.  CARTER gave J.H. his handgun, and
J.H. went to the store alone and robbed the store.  After

robbing the store, J.H. met CARTER and gave him the stolen items.  CARTER gave J.H. a cut of approximately $400 or $500. After CARTER was arrested, CARTER's brother told J.H. that CARTER wanted J.H. to take all the blame for the robbery by saying that J.H. was solely responsible for the robbery and CARTER had nothing to do with the robbery.

31.  On September 23, 2021, I queried law enforcement databases and determined that CARTER has the following criminal history:  a 2011 conviction for Burglary, in violation of Penal Code section 459; a 2015 conviction for Felon in possession of a firearm, in violation of Penal Code section 29800(A)(1); and a 2017 conviction for Grand Theft, in violation of Penal Code section 487(A).

32.  On January 20, 2022, I queried law enforcement databases and determined that J.H. has the following criminal history: a 2011 conviction for Possession of a controlled substance for sale, in violation of Health and Safety Code section 11351.5; a 2012 conviction for Robbery, in violation of Penal Code section 211; a 2017 conviction for Domestic Violence, in violation of Penal Code section 274.5(A); a 2017 conviction for Vehicle Theft, in violation of Vehicle Code section 10851(A); and an April 2018 conviction for Felon in Possession of a Firearm, in violation of 18 USC 922(g).

### E.  Probable Cause to Believe SUBJECT DEVICES Contain Evidence of the SUBJECT OFFENSES

33.  Based on my training and experience, I know that individuals involved in criminal conspiracies, such as the one

described herein, frequently communicate with each other on digital devices, such as cellular telephones.  Those digital devices may therefore have relevant evidence related to an individual's crimes, such as text message communications revealing the planning of such robberies, or future robberies. Co-conspirators may use digital devices to research the location of robberies, discuss with co-conspirators possible locations to target, and discuss meeting locations.  In addition, such phones may reveal communications regarding the proceeds of the robberies.  For example, a phone may be used to organize the sale of the goods obtained from the robbery and to discuss the splitting of robbery proceeds.

### F.    Robberies of ZERO's Affected Interstate Commerce

34.   ZERO's suffered financial loss as a result of the robberies.  The September 14, 2021 robbery resulted in a total loss in goods valued at approximately $8,500.

35.   Law enforcement responded to the scene of the robbery, and as a result of the significant law enforcement presence and investigation following the robbery, ZERO'S was shut down and remained closed for several hours.[5]  Based on the investigation,

---

[5] "To establish the interstate commerce element of a Hobbs Act charge, the government need only establish that a defendant's acts had a *de minimis* effect on interstate commerce."  United States v. Lynch, 437 F.3d 902, 908-09 (9th Cir. 2006) (emphasis added).  The interruption of a business engaged in interstate commerce is sufficient.  United States v. Fierro, 450 F. App'x 586, 588 (9th Cir. 2011) (finding police investigation following robbery of the business, and the resulting interruption in the business, was sufficient to prove interstate commerce).  Robbery of a single individual for a very large sum can directly affect interstate commerce.  See United
*(footnote cont'd on next page)*

I am also aware that ZERO's accept credit card transactions, services clients from outside California, and places orders with and receive goods/inventory from vendors located outside the state of California.

### V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

36.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

37.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

States v. Wang, 222 F.3d 234, 239 (6th Cir. 2000) ("The federal courts have acknowledged, for example, that victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the potential directly to affect interstate commerce.")

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

38.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

17

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CARTER or J.H.'s thumb- and/or fingers on the devices; and (2) hold the devices in front of CARTER or J.H.'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VI. <u>CONCLUSION</u>

41.   For all of the reasons described above, there is probable cause to believe that CARTER committed the SUBJECT OFFENSES and the evidence of the SUBJECT OFFENSES will be found within the SUBJECT DEVICES.

_____
Michael Fukuda, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone this  8 th day of
February, 2022.

_____
UNITED STATES MAGISTRATE JUDGE